ESTATE OF CATHERINE CAMPBELL, DECEASED, VIRGINIA F. MACURDA, INDEPENDENT EXECUTRIX, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Campbell v. Commissioner
Docket No. 7272-86.
United States Tax Court
T.C. Memo 1991-615; 1991 Tax Ct. Memo LEXIS 662; 62 T.C.M. (CCH) 1514; T.C.M. (RIA) 91615; December 12, 1991, Filed *662 Decision will be entered under Rule 155 Michael D. Stuart, for the petitioner. Thomas G. Norman and Richard T. Cummings, for the respondent. WHALEN, Judge. WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in petitioner's Federal estate tax in the amount of $ 3,334,435 and an addition to tax under section 6651(a)(1) in the amount of $ 333,443.50. All section references are to the Internal Revenue Code as amended, unless stated otherwise. After concessions by the parties, there are two issues for decision. The principal issue is the fair market value of certain stock owned by the decedent in a closely held corporation for purposes of computing the decedent's gross estate under section 2031. The second issue is whether petitioner is liable for the additions to tax for late filing of decedent's Federal estate tax return under section 6651(a)(1) and for late payment of decedent's Federal estate tax under section 6651(a)(2). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Catherine Campbell died on July 2, 1982. Throughout *663 this opinion we refer to her as decedent. She was a resident of Harris County, Texas, at the time of her death. On July 20, 1982, letters testamentary were issued by the County Clerk of Harris County to Ms. Virginia F. Macurda, as independent executrix. We refer to Ms. Macurda as executrix. At the time the petition herein was filed, the executrix resided in Houston, Texas. When she died, decedent owned 1,000 shares of the common stock of Campbell Farming Corporation (CFC), a Montana corporation. Her shares in CFC were one-third of the issued and outstanding capital stock of the corporation and were the principal asset of her estate. In July of 1982, CFC was engaged in the businesses of wheat, barley, and other grain farming, cattle production, and several ancillary businesses, including the sale of fertilizer and oil and the operation of a grain elevator. The corporation had been in existence for over 60 years. As of the date of death, the book values and appraised values of CFC's assets, liabilities and stockholders' equity, and the excess of appraised values over book values were as follows: ASSETS
Excess
Book
Appraised
Over Book
Cash
$   211,114
$   211,114
$     -      Accounts receivable
225,865
225,865
-      Livestock inventory
337,648
1,584,497
1,246,849 Other inventory
1,203,834
1,203,834
-      Prepaid taxes
227,469
227,469
-      Total current assets
2,205,930
3,452,779
1,246,849 Prepaid leases
468,624
468,624
-      Investments
Bonds
18,000
18,000
-      Stocks
236,136
575,821
339,685 Minerals
2,400
2,400
-      Total
256,536
596,221
339,685 Land
1,797,855
19,055,000
17,257,145 Net depreciable assets
1,256,283
936,000
(320,283)
Net fixed assets
3,054,138
19,991,000
16,936,862 Notes receivable
201,500
201,500
-      Total Assets
$ 6,186,728
$ 24,710,124
$ 18,523,396 LIABILITIES AND STOCKHOLDERS EQUITY
Current liabilities
$ 1,450,294
$  1,450,294
$     -      Long-term debt
333,377
333,377
-      Total liabilities
$ 1,783,671
$  1,783,671
$     -      Stockholders' equity
4,403,057
22,926,453
18,523,396 Total liabilities &
stockholders' equity
$ 6,186,728
$ 24,710,124
$ 18,523,396 Stockholders' equity
per share
$ 1,468
$ 7,642
$ 6,174 *664 In this opinion, the stockholders' equity of CFC, computed using appraised values, i.e., $ 22,926,453, is referred to as "net asset value." We note that, as shown above, CFC's net asset value computed on a per share basis is $ 7,642. CFC kept its books and reported income for Federal income tax purposes on the basis of a fiscal year ending on March 31. The net income and dividends of CFC for fiscal years 1978 through 1982 are as follows: Fiscal
Net Income
Dividends
Year
Total
Per Share
Total
Per Share
1978
$ 143,700
$ 47.90
$ 60,000
$ 20.00
1979
145,920
48.64
45,000
15.00
1980
238,320
79.44
90,000
30.00
1981
456,270
152.09
105,000
35.00
1982
192,060
64.02
96,000
32.00
At the date of death, company executives anticipated that CFC would realize a net loss for fiscal year 1983 in the amount of $ 400,000 or $ 133 per share. The principal assets of CFC consisted of parcels of land located in Montana and New Mexico on which the company conducted its farming and cattle businesses. The total acreage owned and leased by the company in each State and the fair market value of CFC's interest in those properties on the date of decedent's death *665 are as follows: Location
Owned
Leased
Fair Market Value
Montana
26,297 acres
55,220 acres
$  8,125,000
New Mexico
38,568 acres
--       10,930,000
Total
64,865 acres
55,220 acres
$ 19,055,000
All farming, all of the ancillary businesses, and most of the ranching operations were conducted on CFC's Montana properties which had been acquired by the corporation circa 1917. During fiscal year March 31, 1982, the company realized total gross income of $ 768,789.12 from its business operations in Montana. The New Mexico properties had been acquired by the corporation circa 1940 but efforts to cultivate them through the years had been unsuccessful. At the time of decedent's death, the company's 38,568 acres of land in New Mexico were devoted to raising approximately 200 to 300 head of cattle. During fiscal year March 31, 1982, the company realized total gross income of $ 193 from its business operations in New Mexico. At the time decedent died, the stock of CFC was owned by the following individuals: Shareholder
Number of Shares
Elizabeth Knapp
800
Joan Knapp Crocker
100
Phoebe Knapp Warren
100
Thomas Bassett
500
Stephanie Bassett Gately
500
Catherine Campbell (decedent)
1,000
Total
3,000
*666 All of the above individuals are descendants of Thomas D. Campbell, the founder and original owner of CFC. Set forth below is Mr. Thomas D. Campbell's family tree, showing the number of shares of CFC owned by each of his descendants and, where applicable, the year a descendant died. Thomas D. Campbell (d. 1965) Bess Bull Campbell (d. 1971) Founder, Campbell Farming Corporation * * * * * *
Elizabeth-Ann
Catherine Campbell
Jean Campbell
Campbell Knapp
decedent (d. 1982)
Bassett (d.
800 shares
1000 shares
before 1982) * * * * * *
*
*
*
*
*
*
*
*
Joan Knapp
Phoebe Knapp
Thomas
Stephanie
Crocker
Warren
Campbell
Bassett
100 shares
100 shares
Bassett
Gately
500 shares
500 shares
It is readily apparent that, when decedent died, one-third of CFC's stock was owned by each of Mr. Thomas D. Campbell's three daughters and her children: Decedent owned 1,000 shares; Ms. Elizabeth Ann Campbell Knapp and her two daughters owned a total of 1,000 shares; and, the surviving children of Ms. Jean Campbell Bassett owned 1,000 shares. Thus, each family block held 1,000 shares of stock, or a one-third *667 interest in the corporation. No individual or family block held a majority interest. At the time of decedent's death, members of the Knapp family were not on favorable terms with members of the Bassett family and vice versa. In fact, one or more law suits involving those families were pending, but the record does not describe the nature of the suits. The stock of CFC was unregistered and was not readily marketable. No sales of stock had taken place close to the date of the decedent's death. The only transfers of CFC stock were occasional transfers of small numbers of shares to enable employees to become directors of the corporation, and transfers by Elizabeth Knapp to her descendants. Neither CFC nor any of its shareholders had the right or obligation, either under the corporation's charter or bylaws, or by contract, to acquire decedent's interest in the corporation upon her death. However, an agreement among the shareholders in 1965 restricts the right of shareholders to make voluntary lifetime transfers of their stock to nonfamily members. Under this agreement, the other shareholders and the corporation are given a right of first refusal to purchase at book value any shares *668 to be transferred to a nonfamily member. It is not clear whether a person who received decedent's shares under her will would be subject to the 1965 agreement. At the date of death, no merger, sale, or liquidation of CFC was under active consideration, but the shareholders had discussed liquidation of the corporation approximately one year earlier, in June, 1981, at a special meeting of the shareholders. On January 14, 1981, First Continental Corporation of Billings, Montana, had offered to purchase CFC's Montana farming and cattle assets for $ 7,600,000. The offer was rejected primarily because of the shareholders' concern about the offeror's ability to pay the contract price. Shortly after decedent's death, the executrix retained an attorney, Philip A. Masquelette, Esquire, to assist her with the administration of decedent's estate and to represent the estate in the preparation and filing of a Federal estate tax return. Mr. Masquelette had extensive experience in probate matters and he was then a fellow of the American College of Probate Counsel. In August, 1982, the executrix, acting upon the advice of Mr. Masquelette, retained Standard Research Consultants, Inc. (Standard) *669 to appraise the overall value of decedent's stock in CFC at the date of death. In order to arrive at their opinion of the value of the decedent's stock in CFC, members of Standard's professional staff required appraisals of the company's properties in Montana and New Mexico, as well as a variety of other information. Accordingly, in late November or early December of 1982, the executrix, acting upon the advice of Standard's professional staff and Mr. Masquelette, retained Mr. Russell L. Gasser to appraise the corporation's lands and commercial properties located in Montana and retained Mr. Richard G. Godfrey to appraise the corporation's lands located in New Mexico. Mr. Masquelette advised both appraisers that the appraisal report would be used by Standard's staff in formulating their appraisal of the CFC stock owned by the decedent's estate. Mr. Masquelette also advised the appraisers that the decedent's Federal estate tax return was due on April 2, 1983. Mr. Gasser agreed to submit preliminary appraisal reports between February 15 and 20, 1983, and to submit complete narrative appraisal reports between March 15 and 20, 1983. Mr. Godfrey agreed to submit "value estimates" within *670 90 days and to submit "complete appraisals" within 120 days. By letter dated March 17, 1983, Mr. Godfrey gave his preliminary "value estimates" of the company's New Mexico lands, in the aggregate amount of $ 10,930,000, the same amount as his final appraisal. These estimates were "subject to full appraisal reports." On or about March 21, 1983, Mr. Gasser submitted his appraisal report of the company's commercial properties located in Hardin, Montana, but he stated that his appraisal of the company's Montana lands would be sent later. It was apparent, therefore, despite the efforts of the executrix and Mr. Masquelette, that the final appraisals of CFC's real properties in New Mexico and Montana would not be completed and Standard's staff could not complete their appraisal of the fair market value of CFC stock before April 2, 1983, the due date of the estate tax return. Accordingly, Mr. Masquelette filed with respondent a timely application for extension of time to file decedent's estate tax return. Respondent granted the application and extended the filing deadline until October 2, 1983. Thereafter, Mr. Godfrey completed his appraisal of CFC's New Mexico properties and sent his *671 appraisal report to Mr. Masquelette who received it on April 27, 1983. Mr. Masquelette forwarded the report to Standard on the same day, and he wrote a letter to Mr. Gasser asking about the status of his appraisal of the Montana real properties. Mr. Gasser responded in writing that his appraisal report would be completed in final form by June 1, 1983. In fact, he did not complete the report by that date. On various occasions, the executrix and Mr. Masquelette discussed the October 2, 1983, due date of the estate tax return and the problem posed by the fact that Mr. Gasser had not completed his appraisal when promised. The executrix instructed Mr. Masquelette to "keep after" Mr. Gasser, and Mr. Masquelette placed at least 14 telephone calls to Mr. Gasser from June 1, 1983, to September 23, 1983, to ask about the appraisal report. Mr. Gasser's appraisal report of the company's Montana properties was not received until October 3, 1983, one day after the extended due date of the estate tax return. Mr. Masquelette immediately forwarded it to Standard. Standard's staff completed their appraisal and issued their opinion of the value of CFC stock in the form of a letter dated November *672 14, 1983. The letter states that, as of the date of death, the stock of CFC owned by decedent was worth $ 750 per share. Standard issued a more detailed report dated February 23, 1984. Decedent's Federal estate tax return on Form 706 was filed with the Internal Revenue Service Center in Austin, Texas, and the tax was paid on November 30, 1983. Decedent's 1,000 shares of stock of CFC was valued on the return at $ 750,000. Standard's letter dated November 14, 1983, was attached to the return. OPINION The first issue for decision is the fair market value of the 1,000 shares of CFC stock owned by decedent on the date of her death. This issue arose in the course of computing decedent's gross estate, as required by section 2031. On decedent's Federal estate tax return, the executrix reported $ 750,000 or $ 750 per share as the value of the stock. On the other hand, respondent determined the value to be $ 6,496,000 or $ 6,496 per share in his notice of deficiency and now argues that the value is not less than $ 5,096,000 or $ 5,096 per share. Section 2031(a) requires the "gross estate" of the decedent to be determined for the Federal estate tax purposes, "by including * * * the *673 value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." Generally, the fair market value of an item of property is the amount which a willing purchaser would pay to a willing seller, neither being under any compulsion and both having reasonable knowledge of relevant facts. Sec. 20.2031-1, Estate Tax Regs. This is an objective test and requires the property to be valued from the viewpoint of a hypothetical buyer and seller, each of whom would seek to maximize his or her profit from any transaction involving the property. See Estate of Watts v. Commissioner, 823 F.2d 483, 486 (11th Cir. 1987), affg. T.C. Memo 1985-595; Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981). The value of an item of property as of the date of a person's death is a question of fact. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo 1961-347, cert. denied 377 U.S. 993, 12 L. Ed. 2d 1046, 84 S. Ct. 1920 (1964); Messing v. Commissioner, 48 T.C. 502, 512 (1967). A sound valuation is based upon all the relevant facts. *674 Sec. 20.2031-2(f), Estate Tax Regs. A taxpayer bears the burden of proving that respondent's determination of fair market value of property is wrong. Rule 142(a), Tax Court Rules of Practice and Procedure; Estate of Whitt v. Commissioner, 751 F.2d 1548, 1556 (11th Cir. 1985), affg. a Memorandum Opinion of this Court, cert. denied 474 U.S. 1005, 88 L. Ed. 2d 456, 106 S. Ct. 523 (1985). In valuing the stock of a corporation, actual arm's-length sales of the stock in the normal course of business within a reasonable time before or after the valuation date is the best evidence of fair market value. Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); sec. 20.2031-2(b), Estate Tax Regs. In the absence of such sales, the fair market value of the stock of a corporation is determined by taking into consideration the company's net worth, its prospective earning power and dividend-paying capacity and other relevant factors, including the good will of the business, the economic outlook in the industry, the company's position in the industry and its management, the degree of control of the business represented by the block of stock to be valued, and the value *675 of similar businesses. Sec. 20.2031-2(f), Estate Tax Regs. In this case, there is no evidence of arm's-length sales or transfers of CFC shares that can be used to establish the fair market value of decedent's 1,000 shares of stock in CFC at the time of her death. Therefore, the value of her shares must be determined by taking into consideration the factors mentioned above, such as CFC's net worth, its prospective earning power and dividend-paying capacity. See generally Rev. Rul. 59-60, 1959-1 C.B. 237, which sets forth respondent's approach to valuing the capital stock of a closely held corporation. At trial, petitioner introduced Standard's appraisal report dated February 23, 1984, detailing the analysis made by Standard's professional staff in arriving at the value reported on the decedent's estate tax return, $ 750,000. A vice president of Standard, Mr. Harry H. Ness, testified as petitioner's expert witness. Mr. Ness explained that he and other members of Standard's staff arrived at their opinion of the value of decedent's stock in CFC using two approaches, a comparative company approach which emphasizes CFC's earnings, and a net asset value *676 approach which emphasizes the net value of CFC's underlying assets. Significantly, Standard's staff combined the values they derived under the two approaches by weighing the comparative company value, $ 860, ten times more heavily than the value obtained under the net asset value approach, $ 4,203. Standard's staff considered the resulting value, $ 1,150, to be "fair and reasonable for a minority and noncontrolling block of shares in Campbell, had [the stock] been freely and actively traded, at the valuation date." They then applied a discount of 35 percent due to the lack of marketability of decedent's shares. Accordingly, they arrived at $ 750 per share ($ 1,150 X 65%) as their opinion of the fair market value of decedent's stock in CFC on July 2, 1982. The methodology of Standard's professional staff is summarized as follows: Comparative
Net
Company
Asset
Approach
Approach
Combined
5-yr average earnings
($ 78.42) times 11
$ 863.00
--
--    Book value at 3-31-82,
$ 1,566 times 60%
940.00
--
--    1981 dividends, 32.00,
divided by 5% dividend
640.00
--
--    yield
Net asset value
(stockholders'
--  $ 22,926,453.00 --    equity)
Net asset value per
share (3,000)
--  7,642.00 --    45% discount
--  55%
--    Tentative value
under each approach
860.00
4,203.00 --    Earnings approach
weighted approximately
10 times more heavily
than net
assets
approach
0.9091
0.0909 --  $ 781.83
plus
382.05
=
$ 1,163.88
Freely traded
value (rounded)
--  --      1,150.00
35% discount
--  --      0.65
Fair market value
of decedent's
stock
(rounded)
--  --      $   750.00
*677 Parenthetically, it is worthwhile noting that Mr. Ness drew a correlation in his testimony between the freely traded value of CFC stock which he determined using the above methodology, $ 1,150, and a freely traded value which would be determined using a net asset value approach similar to the one used by respondent's experts, described below. According to Mr. Ness, several publicly traded companies, similar to petitioner, report "total net assets adjusted for inflation." Based thereon, Mr. Ness suggested that it would be reasonable to compute the freely traded value of CFC stock by taking "15 percent of the total net asset value, or net assets at market." That is, 15 percent times net asset value, $ 7,642, or $ 1,146.30. This is equivalent to a minority discount of approximately 85 percent. As mentioned above, respondent determined in his notice of deficiency that the value of petitioner's stock in CFC was $ 6,496,000 or $ 6,496 per share. He arrived at that value by starting with the net asset value of the corporation, $ 7,642 per share, and allowing an overall discount of 15 percent (i.e., $ 7,642 times 85% equals $ 6,495.70). At trial, respondent introduced an appraisal report *678 by, and expert testimony from, Mr. Duane L. Krug, a financial analyst employed by Internal Revenue Service, who opined that decedent's stock in CFC was worth not less than $ 5,095 per share on the date of her death. Mr. Krug followed essentially the same methodology respondent had used in the notice of deficiency. That is, he started with CFC's net asset value, $ 7,642 per share, and applied an overall discount of 33-1/3 percent to allow for all relevant factors, including the minority interest, restriction on lifetime transfers under the 1965 shareholders agreement, low earnings of the corporation, modest dividend payments, and lack of marketability. Mr. Krug arrived at his discount factor, based partly on a comparison of CFC with Tejon Ranch Corporation, a publicly traded corporation, and partly on this Court's decision in Ward v. Commissioner, 87 T.C. 78 (1986). Mr. Krug did not use an earnings approach in valuing the decedent's CFC stock. He stated that he factored the company's low earnings into his opinion through the discount he used. Respondent also called Mr. Larry R. Cook, a certified public accountant and a certified business appraiser, to testify *679 as an expert witness at trial, and respondent introduced into evidence Mr. Cook's appraisal report. Mr. Cook also started with $ 7,642, the corporation's net asset value per share. He then allowed a minority discount of 18 percent, and he allowed a discount of 30 percent to account for the fact that the stock was not readily marketable. The resulting value, $ 4,400 per share [i.e., ($ 7,642 X 82%) X 70% = $ 4,386.51], is his opinion of the fair market value of decedent's stock. Mr. Cook did not use an earnings approach in valuing the stock of CFC. However, he stated that he considered CFC's earnings in determining the marketability discount to be applied. In that connection, he stated that he found three publicly traded "operating companies" and two publicly traded "investment companies" which he considered "analytically" comparable to CFC. Set out below is a comparison of the three valuations of decedent's stock in CFC which were made by or on respondent's behalf: Notice of
Deficiency
Mr. Krug
Mr. Cook
Net asset value
$ 22,926,453.00 $ 22,926,453.00 $ 22,926,453.00 Net asset value
per share (3,000)
7,642.00 7,642.00 7,642.00 Overall 15%
discount
85.00%
--    --    Overall
33.33% discount
--   66.67%
--    18% minority
discount
--   --    82.00%
30% marketability
discount
--   --    70.00%
6,495.70 5,094.92 4,386.51 Rounded
$      6,496.00 $ 5,095.00 $      4,400.00 *680 The above discussion shows that there is a large difference between the valuation made by Standard on petitioner's behalf, $ 750 per share, and the valuations made by Mr. Krug, $ 5,095 per share, and by Mr. Cook, $ 4,400 per share, on respondent's behalf. The principle reason for this difference is the fact that, on one hand, Standard's professional staff valued the subject CFC stock primarily using an earnings approach. While they computed a tentative value using a net asset value approach, they gave very little weight to that value in their final opinion. Respondent's experts, on the other hand, computed the value of CFC stock using only a net asset value approach. They did not use an earnings approach. However, they both stated that they took CFC's earnings into account in determining the discounts which they applied to CFC's net asset value. Petitioner attacks the valuation opinions of respondent's experts on the ground that they are one-sided and are not based upon all valuation factors. Petitioner emphasizes that CFC sells products or services to the public and that CFC is an operating company, rather than an investment or holding type of company. Based on that premise, *681 petitioner argues that Standard's professional staff correctly accorded primary consideration to CFC's earnings, whereas respondent's experts incorrectly accorded greatest weight to the CFC's assets. In support of that argument, petitioner cites Rev. Rul. 59-60, 1959-1 C.B. 237, particularly section 5 of that ruling which states as follows: SEC. 5. WEIGHT TO BE ACCORDED VARIOUS FACTORS. The valuation of closely held corporate stock entails the consideration of all relevant factors as stated in section 4. Depending upon the circumstances in each case, certain factors may carry more weight than others because of the nature of the company's business. To illustrate: (a) Earnings may be the most important criterion of value in some cases whereas asset value will receive primary consideration in others. In general, the appraiser will accord primary consideration to earnings when valuing stocks of companies which sell products or services to the public; conversely, in the investment or holding type of company, the appraiser may accord the greatest weight to the assets underlying the security to be valued. (b) The value of the stock of a closely held *682 investment or real estate holding company, whether or not family owned, is closely related to the value of the assets underlying the stock. For companies of this type the appraiser should determine the fair market values of the assets of the company. Operating expenses of such a company and the cost of liquidating it, if any, merit consideration when appraising the relative values of the stock and the underlying assets. The market values of the underlying assets give due weight to potential earnings and dividends of the particular items of property underlying the stock, capitalized at rates deemed proper by the investing public at the date of appraisal. A current appraisal by the investing public should be superior to the retrospective opinion of an individual. For these reasons, adjusted net worth should be accorded greater weight in valuing the stock of a closely held investment or real estate holding company, whether or not family owned, than any of the other customary yardsticks of appraisal, such as earnings and dividend paying capacity.
Respondent attacks the valuation opinion of petitioner's experts on the ground that it is one-sided and not based upon all valuation *683 factors. He argues, conversely from petitioner, that his experts correctly accorded greatest weight to CFC's assets and that petitioner's experts incorrectly accorded primary consideration to earnings. He points out that Standard's methodology which is based upon CFC's earnings is, in effect, a valuation of only the company's Montana properties which produced those earnings. He argues that it virtually omits the $ 10,930,000 worth of property which CFC owns in New Mexico because those properties produced none of CFC's earnings. Thus, respondent argues that Standard's valuation "fails to take into consideration the substantial value of the corporation's underlying assets." Respondent correctly argues in his post-trial brief that the valuation of CFC's stock should not be based upon a single approach, either an earnings approach or a net asset value approach, but should be based upon all factors, and he cites cases in which we have advanced that principle. Harwood v. Commissioner, 82 T.C. 239 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986), cert. denied 479 U.S. 1007 (1986); Estate of Andrews v. Commissioner, 79 T.C. 938, 945 (1982); *684 Dooly v. Commissioner, T.C. Memo 1972-164. Respondent also acknowledges in his brief that the "net asset value is not the only valuation method that should be employed in this case." Respondent claims to have taken CFC's earnings into account through the "discounts from the net asset value" which his experts employed. He asserts that this technique was specifically approved by the Court in Ward v. Commissioner, 87 T.C. 78 (1986). We do not fully agree with the position of either party or with the position of any of the experts. We believe that the truth lies somewhere between those extremes. Turning first to petitioner's position, we agree that the nature of a company's business must be taken into consideration in deciding the weight to be accorded to the various factors, such as earnings and the value of the company's underlying assets, which influence the amount which a willing buyer would pay for the stock of the company. However, in valuing CFC we do not agree that we should focus on the company's historical earnings to the virtual exclusion of its net asset value, simply because the corporation was engaged in some business activities *685 on the valuation date. As we stated in Estate of Andrews v. Commissioner, supra: regardless of whether the corporation is seen as primarily an operating company, as opposed to an investment company, courts should not restrict consideration to only one approach to valuation, such as capitalization of earnings or net asset values. Certainly, the degree to which the corporation is actively engaged in producing income rather than merely holding property for investment should influence the weight to be given to the values arrived at under the different approaches but it should not dictate the use of one approach to the exclusion of all others. [79 T.C. at 945, citations omitted.]
This is especially true here because, in addition to CFC's characteristics as an operating company, it also had elements of an investment or real estate holding company. For example, the only business activity which CFC conducted on its 38,568 acres of land in New Mexico consisted of raising of 200 to 300 head of cattle. The properties were worth $ 10,930,000, but the corporation realized only $ 193 of net income and $ 5,500 of net cash flow from those properties *686 during fiscal year 1982. Therefore, a reasonable hypothetical buyer and seller of CFC stock would not value CFC's stock solely on the basis of the corporation's earnings. They would place greater weight than Standard has on the company's underlying assets. Under Standard's methodology, the impact of CFC's net asset value is minimized due principally to the fact that the value computed under the earnings approach is weighted approximately 10 times more heavily than the value computed under the net asset value approach. If Standard's methodology were changed to give equal weight to the tentative values computed under their comparative company approach and their net asset value approach, then the fair market value determined under that methodology would be approximately $ 3,290 per share. Our computation of that amount is as follows: Comparative
Net
Company
Asset
Approach
Approach
Combined
Tentative value
under each approach
$ 860
$ 4,203
--  Earnings approach and
net assets approach
given equal weight
1 1  --  860
plus
4,203
=
$ 5,063
Freely traded
value (rounded)
-- --  5,060
35% discount
-- --  0.65
Fair market value
of decedent's stock
(rounded)
-- --  $ 3,290
*687 Similarly, we believe that the valuations of both respondent's experts are too one-sided. They are both based entirely on a net asset value approach, and, in our view, they suffer from the same defect which we found in Standard's valuation. Mr. Krug testified that he determined that CFC "was basically an asset holding company as opposed to an operating company" and he applied a valuation approach based upon the net value of the company's assets. Mr. Krug failed to give sufficient weight to various factors which suggest that CFC was not an asset holding company. For example, CFC had been in existence for over 60 years and the company continued to operate in the same manner throughout its history, even approximately 25 years after its founder died. During that time, CFC's land holdings have appreciated tenfold, but there is no evidence that the corporation or its shareholders were holding assets for sale. Therefore, in view of the fact that CFC was not exclusively an investment company but had some elements of an operating company, we do not believe that Mr. Krug has taken into account all relevant factors in his appraisal. Mr. Cook, on the other hand, acknowledged that CFC *688 was "a going concern and an operating company." Mr. Cook suggested that, while CFC is an operating company, it had a large segment, consisting of the New Mexico properties, which was similar to a holding company segment. However, his report states that he and members of his firm "were retained to express our opinion estimate of applicable discounts, if any, from a 'freely traded value -- net asset value approach' determined by another appraisal firm, Standard Research Consultants." It appears, therefore, that Mr. Cook's engagement was limited to determining the discounts to be used in respondent's predetermined approach. According to Mr. Cook, an appropriate minority discount in the case of a small interest in a corporation is 33 percent, but he applied an 18-percent discount in valuing the decedent's shares. He applied a lower minority discount in this case for the following reasons: Number one, the size of the bloc of stock that was being appraised represented one-third of the company. There were six shareholders. This was the largest bloc within that company. Secondly, I approached from the standpoint of minority discount that that size of bloc of stock represented a *689 significant influence. I also considered the fact that the minority interest that was being appraised could not influence, on it [sic] own right, and control the company. I looked to federal Tax Court cases that had been available, and I have cited those in there. I also looked to the marketplace, if you will, to comparable companies to see what discounts were going on in the market place and then ultimately reached a conclusion on a minority discount.
Mr. Cook's opinion about the size of minority discount is speculative and not based on any hard data. We are not convinced that an 18-percent minority discount is sufficient. While the decedent's one-third interest in the company was the largest single block of stock, there is no evidence that a buyer of those shares could disproportionately influence the corporation to abandon its farming and cattle operations in order to realize the value of the underlying lands through sales of selected parcels or wholesale liquidation. Indeed, the fact that there were differences between the other two family blocks might cause a willing buyer to apply a steeper minority discount due to fear that the corporation would become deadlocked. *690 In any event, we note that if Mr. Cook's analysis were changed to apply the same minority discount to CFC as he stated was applicable generally, i.e., 33 percent, then the fair market value of decedent's stock in CFC would be $ 3,566 i.e., ($ 7,642 X 66.67%) X 70%. We note that we are not bound by the opinions of any of the experts who testified at trial but may use them to assist in deciding upon a value. E.g., Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo 1974-285; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). One expert may be persuasive on a particular element of valuation and another expert may be persuasive on another element. Parker v. Commissioner, 86 T.C. 547, 562 (1986). Consequently, we may adopt some aspects of an expert's testimony and reject others. Helvering v. National Grocery Co., 304 U.S. 282, 82 L. Ed. 1346, 58 S. Ct. 932 (1938). In formulating our decision of the fair market value of the decedent's shares of CFC stock on July 2, 1982, we have reviewed the record in this case and have taken into consideration all of the factors which would have an impact on *691 the price which a willing buyer would pay to a willing seller for the stock. Among others, the factors which we have taken into consideration include: CFC's low earnings; the anticipated net loss for fiscal year 1983; CFC's historical dividends; its net worth; the fair market value of its land holdings; the operation of the company during its 60-year history and the likely manner it will operate in the future; the fact that the shareholders discussed liquidation of the corporation in June of 1981; the fact that in January of 1981 First Continental Corporation of Billings had offered to purchase CFC's Montana farming and cattle assets for $ 7,600,000, and the fact that the offer was rejected by the shareholders; the degree of control represented by the decedent's block of stock; the impact of the 1965 shareholders agreement; the fact that Standard's valuation would be $ 3,290 per share, if its methodology were changed to give equal weight to its comparative company and net asset value approaches; and, the fact that Mr. Cook's valuation would be $ 3,566, if the minority discount were changed from 18 percent to 33-1/3 percent. Based upon the foregoing, we find that the fair market value *692 of the decedent's stock in CFC on July 2, 1982, was $ 3,300 per share or $ 3,300,000. The second issue for decision is whether we should sustain respondent's determination that petitioner is liable for the addition to tax under section 6651(a)(1) for failure to file a timely return and the addition to tax under section 6651(a)(2) for failure to make timely payment of tax. The addition to tax imposed under each paragraph of section 6651(a) applies, "unless it is shown that such failures are due to reasonable cause and not due to willful neglect." The burden is on the taxpayer to prove that the failure is due to reasonable cause and not willful neglect. United States v. Boyle, 469 U.S. 241, 245, 83 L. Ed. 2d 622, 105 S. Ct. 687 (1985); Davis v. Commissioner, 81 T.C. 806, 820 (1983), affd. without opinion 767 F.2d 931 (9th Cir. 1985); Estate of Newton v. Commissioner, T.C. Memo 1990-208. This is a "heavy burden." United States v. Boyle, supra at 245. In order to prove "reasonable cause," a taxpayer must show that he exercised ordinary business care and prudence but nevertheless was unable to file the return within *693 the prescribed time. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. In order to disprove "willful neglect," a taxpayer must prove that the late filing did not result from a "conscious, intentional failure or reckless indifference." United States v. Boyle, supra at 245-246. A "conscious" or "intentional" failure exists when the taxpayer was aware of his duty to file a return within the due date, but failed to file the return under circumstances that do not justify such failure. "Reckless indifference" is established when the taxpayer was aware of his duty to file on time, but disregarded a known or obvious risk that the return might not be filed within the due date. The original due date of petitioner's Federal estate tax return was April 2, 1983, 9 months after the date of decedent's death. Sec. 6075(a). Petitioner applied for and obtained an extension of the due date, until October 2, 1983. Sec. 6081(a). The parties agree that decedent's estate tax return was filed on November 30, 1983, approximately 2 months later. Accordingly, in the notice of deficiency, respondent determined an "Addition to Tax Under Internal Revenue Code Section 6651(a)(1)" in *694 the amount of $ 333,443.50, that is, 5 percent of the increase in tax determined in the notice for each of the 2 months the return was late. Respondent did not determine an addition to tax under section 6651(a)(2) for late payment of tax, notwithstanding statements in the parties' briefs which may suggest otherwise. In this case, the total amount of both additions would have been the same even if he had. See sec. 6651(c)(1). Prior to the time the petition was filed, petitioner's representatives paid additions to tax under section 6651(a)(2) for late payment of estate tax. The petition alleges that additions to tax under section 6651(a)(1) and 6651(a)(2) were paid in the amounts of $ 9,232.29 and $ 5,716.96, respectively, and asks the Court to hold that these additions "were not lawfully due by petitioner and that petitioner is entitled to refunds." The record supports a finding that petitioner paid additions to tax under section 6651(a)(2) in the amount of $ 5,716.96 and $ 2,051.62. In its post-trial briefs, petitioner makes reference to the additions under section 6651(a) for "failure to timely file/pay." Similarly, respondent argues in his post-trial brief that "petitioner *695 is liable for the additions to tax for late filing of the estate tax return and late payment of the estate tax under I.R.C. §§ 6651(a)(1) and 6651(a)(2), respectively, as determined by respondent." We interpret those statements to be references to the addition to tax under section 6651(a)(1) in the amount of $ 333,443.50 which was determined by respondent in the notice of deficiency, and to the additions to tax under section 6651(a)(2) in the aggregate amount of $ 7,768.58 which were assessed by respondent and paid by petitioner before the petition was filed. Petitioner concedes that it failed to file a timely tax return and failed to timely pay the estate tax. It argues that such failures were due to reasonable cause and not due to willful neglect. Petitioner's argument is that the executrix was advised by Mr. Masquelette that she could not file an incomplete return. She says that she relied upon that advice and delayed filing the estate tax return until Mr. Gasser had submitted his appraisal and Standard had formulated its opinion of the value of CFC stock, based in part on that appraisal. Petitioner maintains that the executrix's reliance on Mr. Masquelette's advice constitutes *696 "reasonable cause" for her late filing of the estate tax return. Petitioner also maintains that its inability to obtain the appraisal was "beyond its control" and did not result from a "deliberate or conscious choice" on its part, and thus, the failure to timely file the return was not "willful." Respondent argues that the additions to tax were properly determined because the executrix had a nondelegable duty to file a timely tax return and to pay the tax. Nevertheless, he argues, she "willfully neglected" to meet those obligations and her reliance on Mr. Masquelette's advice did not establish "reasonable cause for those failures." Respondent argues that petitioner should have filed a timely return based on the best information available before the due date. We agree. While petitioner's inability to obtain Mr. Gasser's appraisal report may have been beyond its control, we are not convinced that it was beyond petitioner's control to file a timely return and pay the tax. In effect, we do not agree that Mr. Gasser's appraisal of the corporation's Montana properties was essential to filing a substantially correct tax return. To state otherwise is to suggest that petitioner could *697 not have sought an appraisal from another qualified appraiser in June of 1983 when Mr. Gasser missed the June 1st deadline, or to suggest that petitioner could not have made a reasonable estimate of CFC's Montana lands based upon other valuations, such as the offer made by First Continental Corporation or property tax assessments. In this regard, we note that under Standard's methodology, the net asset value of the corporation was given less than 5 percent of the weight. The regulations require only that an estate tax return be "as complete as possible." Section 20.6081-1(c), Estate Tax Regs. They also permit supplemental information affecting the tax liability to be filed after the expiration of the extension period. Section 20.6081-1(c), Estate Tax Regs. Moreover, Mr. Masquelette's advice boils down to the fact that the estate tax return on Form 706, like every Federal tax return, contains the taxpayer's statement that the return is "true, correct, and complete." Mr. Masquelette, testified as follows concerning his "advice" to the executrix: Q In your opinion, did Mrs. Macurda rely upon you as her attorney in giving her advice as to her ability to file a return without *698 the value of the most significant asset? A Yes. I explained the law to her, which was that she could not file the return unless it was true, correct and complete, and it is my understanding, from everything she said at the time, that she was relying on that advice.
Petitioner's post-trial brief explains that "the basis for the attorney's advice to the executrix was a statement on the front page of Form 706 requiring [petitioner's signature] under penalties of perjury that the form and accompanying schedules were 'true, correct and complete.'" We do not agree that Mr. Masquelette's so-called "advice" is sufficient to establish "reasonable cause" for failure to file the subject estate tax return. United States v. Boyle, supra. To hold otherwise would be to make the additions under section 6651(a) optional for any taxpayer who claims to have delayed filing based on attorney advice that the return must be true, correct and complete. A taxpayer's inability to obtain information does not generally constitute "reasonable cause" if she could have filed a timely return with a reasonable degree of accuracy based on her best knowledge. See Estate of Vriniotis v. Commissioner, 79 T.C. 298, 311 (1982); *699 Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1343 (1971), affd. without opinion 496 F.2d 876 (5th Cir. 1974); Fluet v. Commissioner, T.C. Memo 1986-555; Hines v. Commissioner, T.C. Memo 1982-589; Terrell v. Commissioner, T.C. Memo 1981-527; Hackett v. Commissioner, T.C. Memo 1970-17. The executrix was aware of her duty to file within the due date, and yet consciously failed to file a timely return and pay the estate tax. Therefore, petitioner is liable for additions to tax under section 6651(a)(1), and (a)(2). To reflect the foregoing and certain agreements of the parties, Decision will be entered under Rule 155.