**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3996-21

JAIME G. WILLIAMSBERG,
f/k/a JAIME G. WEINBERG,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

APARRI, LLC and JAN R.
WEINBERG,

      Defendants-Appellants/
      Cross-Respondents.

_____

> Argued November 6, 2023 – Decided December 26, 2023
>
> Before Judges Sabatino and Marczyk.
>
> On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0457-17.
>
> Jonathan M. Preziosi argued the cause for defendants-appellants/cross-respondents (Lewis Brisbois Bisgaard & Smith, LLP, attorneys; Jonathan M. Preziosi, Brian Deeney and Colman Preziosi, of counsel and on the briefs).
>
> Deirdre T. Cooney argued the cause for plaintiff-respondent/cross-appellant (Walsh Pizzi O'Reilly

Falanga, LLP, attorneys; Marc Denis Haefner, of counsel and on the briefs; Deirdre T. Cooney, on the briefs).

PER CURIAM

This litigation concerns an intrafamily dispute over a limited liability company that owns a mixed-use real estate parcel in Princeton. For the reasons that follow, we affirm the trial court's determinations and reject both the appeal and cross-appeal.

I.

The property in question has been owned by a New Jersey limited liability company, defendant Aparri, LLC ("the LLC"), formed in June 2001. Originally the LLC had three members with equal one-third shares: defendant Jan R. Weinberg ("Jan"), his then-wife Joy T. Weinberg ("Joy"), and their son, plaintiff Jaime G. Weinberg, now known as Jaime G. Williamsberg ("Jaime").[1] Part of the premises has been rented to residential tenants and another portion utilized for the family's real estate business.

In 2006, Jan and Joy divorced. In 2013, Joy failed to make a capital contribution requested by Jan, which resulted in her being expelled from the

---

[1] To avoid confusion, we use first names for these individuals with common surnames, as do the briefs and the trial court decisions. No disrespect is intended.

LLC. Her ownership interest in the LLC was then equally divided between Jan and Jaime, leaving them each with 50% ownership.

Then, in 2015, Jaime notified Jan he was withdrawing from the LLC and demanded to be paid the fair market value of his 50% interest, pursuant to the terms of the operating agreement the members signed the day the LLC was formed.

Jan rejected Jaime's payment demand, asserting that Jaime was due nothing on his withdrawal. Jan contended the buyout provision in the original operating agreement was included by mistake by the attorney who drafted it in 2001. Jan alleged that a revised operating agreement, which did not contain a buyout provision, was prepared by an attorney and executed by the three members the week after the original was signed. However, Jan was unable to produce a signed copy of the alleged amended version. Nor was the attorney able to find a signed copy of the amended agreement in her files, having only a signed copy of the original version.

Under Jan's protest, the parties retained an appraiser. Jaime agreed to that appraiser's valuation of the LLC and requested payment of half the amount. Jan continued to decline payment and asserted that the amended agreement entitled Jaime to nothing.

 A-3996-21

Consequently, Jaime filed this lawsuit against Jan and the LLC in the Law Division to collect payment for his interest in the company. After the trial court bifurcated the case, the trial court held two successive bench trials, the first to establish which of two alleged LLC operating agreements is enforceable, and the second to value Jaime's interest in the LLC.

In the first trial, the court ruled the original executed operating agreement—and not the unsigned amended version asserted by Jan—contained an enforceable buyout provision entitling LLC members, who voluntarily withdraw, to payment of the fair market value of their interests. The court applied a clear-and-convincing evidentiary standard to Jan's proof of the allegedly lost document, rather than a preponderance-of-the-evidence standard that Jan had advocated.

In the second trial, presided over by a different judge,[2] the court heard competing testimony by experts for both sides. Jaime's experts advocated an asset-based approach which valued the LLC at $594,000, and defendants' expert advocated an income-based "going concern" approach that valued the LLC at $221,500. The judge adopted the method of Jaime's experts, which valued

_____

[2] The first and second judges are both now retired.

Jaime's one-half interest as $297,000. However, the judge denied Jaime's request for a discretionary award of prejudgment interest.

The LLC and Jan have appealed, arguing the trial court erred in rejecting the amended operating agreement and in its valuation of Jaime's interest. Jaime cross-appeals the denial of prejudgment interest.

## II.

The scope of our review of the trial court's decisions that followed these two non-jury trials is guided by well-settled principles. "Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974) (considering the scope of appellate review in a civil non-jury case). "Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility." Cesare v. Cesare, 154 N.J. 394, 412 (1998). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

A.

The first issue we address is Jan's appeal of the trial court's determination that the original operating agreement, rather than the alleged amended agreement, controls the disposition of Jaime's interest. For context, we briefly describe pertinent aspects of the LLC statutory scheme.

LLCs may operate by the default rules of the Revised Uniform Limited Liability Company Act, N.J.S.A. 42:2C-1 to -94 (the "RULLCA"), or by a custom agreement, called an operating agreement, that must incorporate some default rules but may rewrite others. N.J.S.A. 42:2C-11(b). Relevant here, operating agreements may customize the process and rights of member withdrawal.[3] See N.J.S.A. 42:2C-11.

The RULLCA "is to be liberally construed to give the maximum effect to the principle of freedom of contract and to the enforceability of operating agreements." N.J.S.A. 42:2C-11(i). "The statute thus encouraged LLC members to collectively devise an individualized governance and management plan that best advanced the goals of their business." IE Test, LLC v. Carroll,

---

[3] By default, members may "dissociate" from an LLC when "[t]he company has notice of the person's express will to withdraw as a member." N.J.S.A. 42:2C-46. "When a person is dissociated . . . any transferable interest owned by the person immediately before dissociation in the person's capacity as a member is owned by the person solely as a transferee." N.J.S.A. 42:2C-47(a).

A-3996-21

226 N.J. 166, 177-78 (2016) (commenting on the LLCA, the precursor statute to the RULLCA, albeit both have identical purpose statements).

"[A] draft operating agreement does not become the operating agreement of an LLC unless it is 'the agreement . . . of all the members of' the LLC, N.J.S.A. 42:2C-2, . . . ." Premier Physician Network, LLC v. Maro, 468 N.J. Super. 182, 194 (App. Div. 2021). "The Act does not specify how the members must indicate their agreement to a draft operating agreement in order to render it effective." Id. at 195. The Act "does not require their agreement to be bound by an operating agreement be in writing or that it be executed by them. In fact, the operating agreement itself need not be written and may be oral. N.J.S.A. 42:2C-2." Ibid. Jan and the LLC contend the revised operating agreement was, in fact, signed by all three LLC members, even though Jan has been unable to locate an executed copy. Their argument implicates the so-called "lost document" doctrine of commercial law.

For decades, New Jersey generally has required that, to prove the terms of a lost document claimed to be an enforceable agreement, the proponent of the missing agreement must prove its existence with clear and convincing evidence. See, e.g., Zuckermandel v. Zuckermandel, 135 N.J. Eq. 598, 598-99 (Ch. 1944) (finding insufficient evidence to prove by "clear" and "convincing" evidence

that a lost instrument conveyed a business interest between spouses); <u>Farber v. Plainfield Tr. Co.</u>, 136 N.J. Eq. 183, 185 (Ch. 1945) (requiring the proponent of a lost agreement with a railroad company granting the proponent access to railroad tracks to prove the lost agreement's existence with "clear and convincing" evidence).

Defendants contend the trial court should have applied to this issue the lesser evidentiary standard of a preponderance of the evidence. In that vein, they cite to an older Chancery case, <u>Maddock v. Connolly</u>, 82 N.J. Eq. 533 (Ch. 1913), for the proposition that the standard is "reasonably certain" and "cogent" evidence. However, that case actually states the standard is "clear and cogent," which we view is the same as clear and convincing. 82 N.J. Eq. at 534. Defendants assert this test is effectively the same as a preponderance standard. Additionally, defendants rely on this court's opinion in <u>Borough of Sayreville v. Bellefonte Insurance Co.</u>, 320 N.J. Super. 598, 603 (App. Div. 1998), which allowed the existence of an insurance contract to be proven by only a preponderance of the evidence.

We agree with the trial court that a clear and convincing burden of proof applied to defendants' assertion of an enforceable "lost" LLC operating agreement. We concur with the court that defendants' reliance on <u>Borough of</u>

8

Sayreville is misplaced.  In that opinion, we acknowledged that the court in Zuckermandel had "referred approvingly to other courts which, in establishing missing 'instruments' by parol proofs, and applied standards of proofs described as 'clear,' 'cogent,' 'reasonably certain' and 'convincing'".  Id. at 603.  Adopting the reasoning of a Delaware federal district court in Remington Arms Co. v. Liberty Mutual Insurance Co., 810 F.Supp. 1420, 1426 (D.C. Del. 1992), we chose in Borough of Sayreville to depart—in that insurance policy context— from those "usual standard[s] in civil matters," because a "typical insurance dispute" is "unlike those civil cases where the exceptional standard of clear and convincing evidence was applied."  Ibid.  We therefore applied a preponderance standard to the missing insurance policies, "[i]n the absence of any claim of fraud."  Id. at 604.

In the present case, the trial court reasonably distinguished insurance policies, as form contracts unlikely to be fabricated, from LLC operating agreements, which are often non-form documents tailored to the express intentions of LLC members and which are more susceptible to fraud or fabrication.  We also are unpersuaded that Maddock v. Connolly, which preceded the later Chancery opinions in Zuckermandel and Farber, warrants a lesser burden of proof.

A-3996-21

The clear and convincing standard was appropriately applied. Even if, hypothetically, a preponderance standard applied, we are satisfied the evidence of a revised agreement presented to the trial court fell short of that mark as well.

Defendants argue it is implausible to conclude that the parties acted quickly to pay an attorney to correct the agreement but then did not sign the amended version. They contend the existence and content of the amended agreement was proven by: (1) a fax from the attorney who drafted the agreement attaching corrected pages; (2) a complete but unsigned amended agreement; and (3) the testimony of the attorney, who authenticated those documents and testified to making changes at Jan and Jamie's request. The trial court nonetheless reasonably concluded that defendants' narrative was not shown to be as credible as plaintiff's version.

Among other things, we note that although Jan contended that four copies of the amended agreement were allegedly signed, he admitted that his own copy was missing. Despite his decades of business experience, Jan stated he signed the original agreement without first reading it to confirm it was drafted as he had requested, and only read it for the first time hours after its execution.

Jan chose not to ask his ex-wife Joy for her copy ostensibly because of their divorce, and apparently no third-party deposition notice or subpoena to

obtain it was ever served on her. The attorney who drafted the agreements denied ever receiving a signed copy of an amended version and could find none in her file.

Meanwhile, in his own testimony, Jaime denied ever signing or receiving an amended agreement. Defendants failed to persuade the trial court why, if Jaime were lying and actually believed the amended agreement existed, he would logically withdraw from the LLC knowing that agreement would entitle him to nothing in return for the substantial capital he had invested in it.

Further, the trial testimony and the LLC tax returns reasonably supported Jaime's contention that the members adhered to the original agreement by acting in accordance with Section 4.01(b) of that document in reapportioning Joy's interest evenly between Jan and Jaime upon her failure to participate in the call for a capital contribution. Section 10.04(b) of that original agreement prescribed that the removed member's interest "will be transferred to the remaining [m]embers <u>pro rata</u> . . . ." (emphasis added). By contrast, the alleged amended agreement provided in Section 10.04(b) that "[a] Member may be removed with the unanimous vote of all the other Members, in which event the removed Membership interest will be transferred [entirely] <u>to Jan R. Weinberg</u>." (emphasis added). The LLC's tax returns for 2013 through 2015 (the years

immediately following Joy's removal in 2013), listed Jan and Jaime as 50% owners of the LLC, not as 66.6% and 33.3% owners.

We recognize Jan did assert at trial that "[w]hen Joy [] was no longer a partner of Aparri LLC her interest should have reverted to me solely, not split 50/50 . . . [per] the revised operating agreement." Nevertheless, the evidence reasonably shows that the parties—in practice—followed the original, not the supposedly amended agreement, in removing Joy and in dividing her interest equally rather than transferring it completely to Jan.

Applying, as we must, the deference we owe to a trial court's factual and credibility findings in a non-jury case, Rova Farms, 65 N.J. at 506, we conclude there is "adequate, substantial, and credible evidence" to support the trial court's determination that the original operating agreement governed the parties' relationship when Jaime withdrew and asked to be bought out.

### B.

The second set of issues we address concern defendants' arguments that the trial court miscalculated Jaime's rightful share after the valuation phase of the case. Among other things, defendants maintain the trial court erroneously adopted the net asset valuation method of plaintiff's expert by treating the LLC akin to a real estate holding company. In addition, defendants argue the trial

court incorrectly omitted a property management fee of $80,333.08 allegedly owed to Weinberg Management Company ("WMC"), an entity controlled by Jan, and also erred by omitting transaction costs associated with any hypothetical sale.

"Our standard of review for valuation disputes is deferential because the valuation of closely[-]held corporations is 'inherently fact-based[,]' not based in 'exact science,' and 'frequently become[s] battles between experts." Sipko v. Koger, Inc., 251 N.J. 162, 179 (2022) (alterations in original). "In a bench trial, the acceptance or rejection of an expert's opinion as to valuation of a corporation, and the expert's methodology, are matters peculiarly within the province of the trial court." Denike v. Cupo, 394 N.J. Super. 357, 381-82 (App. Div. 2007) (reversed on other grounds, 196 N.J. 502 (2008)). "The judge's findings are thus entitled to great deference and will be reversed only if the trial judge abused his discretion." Ibid.

A trial court's valuation should be affirmed if "there is sufficient credible evidence to support both the method of computation and the quantum of value determined by the court." Middlesex Cnty. v. Clearwater Vill., Inc., 163 N.J. Super. 166, 174 (App. Div. 1978). However, "'we need not give deference to the trial judge's determinations of what discounts or premiums the determination

of fair value may include, or must exclude, since they are questions of law.'" Sipko, 251 N.J. at 179 (quoting Casey v. Brennan, 344 N.J. Super. 83, 110 (App. Div. 2001)).

The LLC's governing operating agreement in Section 10.04(a) entitles a withdrawing member to the sum "determined by multiplying the Member's Percentage Interest hereto by the fair market value of the Company as of the close of the month preceding the month in which the Member's interest is terminated." (emphasis added). Jaime withdrew from the LLC by letter dated July 21, 2015, and stated the effective date of his withdrawal was January 21, 2016. Therefore, December 31, 2015 is the undisputed date to value the LLC.

The operating agreement prescribes that "fair market value shall be established by a certified public accountant selected unanimously by all the Members." However, despite the pre-lawsuit real estate appraisal that was conducted, the parties ultimately could not agree on a valuation of the LLC and submitted the question to the trial court, which duly considered testimony from competing experts.

Fair market value is "'what a willing buyer and a willing seller would agree to, neither being under any compulsion to act.'" Borough of Saddle River v. 66 East Allendale, LLC, 216 N.J. 115, 136 (2013) (quoting State v. Silver, 92 N.J.

507, 513 (1983)). We are satisfied the trial court reasonably adopted the approach of plaintiff's expert, who construed the LLC's operations as having characteristics of a real estate holding company under Section 5(b) of IRS Revenue Ruling 59-60, and thus its fair market value should be valued by the properties in its portfolio.

Defendants cite to various decisions of the United States Tax Court that expound upon the definition of a real estate holding company. See Est. of Tanenblatt v. Comm'r, 106 T.C.M. (CCH) 579 (2013) (defining a real estate holding company as "managed not for current income but, rather, for appreciation in the value of its holdings"); Est. of Campbell v. Comm'r, 62 T.C.M. (CCH) 1514 (1991) (similarly defining the term as a company that owns assets for value appreciation, not income). They maintain the definition of a real estate holding company should be strictly confined to only businesses that trade real estate for profit. They argue the LLC's real property was not purchased for capital appreciation and resale, noting that the LLC generates income by renting the property to residential tenants and intends to continue doing so. Hence, they submit the LLC is an operating company, not a holding one.

Although defendants' arguments in this regard are not without probative

15

force, the trial court nevertheless had adequate grounds for choosing to adopt the net asset method of plaintiff's experts. With regard to IRS Revenue Ruling 59-60's definition of a real estate holding company, the IRS recommends that "'all available financial data, as well as all relevant factors affecting the fair market value, should be considered.'" Bowen v. Bowen, 96 N.J. 36, 44 (1984) (quoting Rev. Rul. 59-60 at § 4.01). "Generally, greater weight will be given to earnings factors for those companies that sell products or services, and to asset values for investment or holding companies." Ibid. "No formula can be devised that will be generally applicable to the multitude of different valuation issues arising in [the valuation of closely held companies]." Rev. Rul. 59-60 at § 3.01. This IRS guidance encourages tailoring valuations to the particular structure of the business to be valued, not to force the business into a predetermined valuation framework.

The trial court adopted such a business-specific valuation approach encouraged by the IRS. Plaintiff's valuation experts recognized the LLC's income derived entirely from one asset, the Princeton property, whose value was readily estimable from transactions of similar real estate. This comported with the IRS's statement that "[t]he value of a closely held investment or real estate holding company . . . is closely related to the value of the assets underlying the

stock." Rev. Rul. 59-60 at § 5(b). An expert for plaintiff reasonably discounted the real estate appraisal by 10% to consider the challenges associated with marketing a closely-held business, and declined to make further adjustments after reviewing the LLC's financial documents, deposition testimony from this litigation, and industry research.

On the other hand, the trial court reasonably rejected the opinion of defendants' valuation expert as "def[ying] logic" by suggesting the value of the LLC is $221,500. As the court observed, no "willing seller" would realistically accept less for its business than the seller could obtain by selling its only asset, here the Princeton property. This reasoning is sensible and we decline to overturn it.

In addition, we are unpersuaded by defendants' contention that the court was required under Musto v. Vidas, 333 N.J. Super. 52 (App. Div. 2000), to adopt a going-concern valuation method to determine this particular LLC's fair market value. We qualified our discussion in Musto by saying that "[g]enerally" in valuation cases a closely-held corporation "must be valued as a going concern." Id. at 63. We did not rule out in Musto possible exceptions to that general principle. Defendants cite to no other published New Jersey cases applying Musto, and the out-of-state cases they rely upon are not binding.

17

As our first opinion in that case noted, <u>Musto</u> involved a multi-state engineering firm with two divisions and offices located in six states and the District of Columbia. 281 N.J. Super. 548, 551 (App. Div. 1995). The enterprise employed as many as 500 people with annual revenue of up to $25 million. <u>Id.</u> at 553. The present matter, involving a single parcel in Princeton and a family-owned-and-operated LLC with no apparent additional employees, is not a comparable "going concern." Although we need not here delineate all of the possible applications of and exceptions to <u>Musto</u>, we simply conclude that the trial court did not manifestly err in adopting the net asset valuation approach in this particular case.

Further, the trial court reasonably declined to adjust the LLC's value by subtracting transactional costs attendant to a hypothetical sale of the property contemplated by the valuation analysis. Testimony by plaintiff's expert, as relied on by the trial court, sufficiently established why such costs need not be subtracted from the valuation of the property.

Nor was the trial court obligated to reduce the LLC's value by a sum allegedly owed to WMC for deferred property management fees. At trial, Jan was unable to produce written consent from the other LLC members authorizing him to borrow funds on behalf of the LLC, as required by the operating

18

agreement.  The trial court reasonably found Jan's testimony about the unpaid fees was not persuasive, and the spreadsheet reflecting this alleged debt was insufficient to establish the debt's existence.

C.

Turning briefly to plaintiff's cross-appeal, we are unconvinced the trial court misapplied its wide discretion in declining to award prejudgment interest in this commercial litigation.  "New Jersey case law distinguishes between pre-judgment interest as a discretionary allowance, and post-judgment interest to which a litigant is entitled as of right."  Interchange State Bank v. Rinaldi, 303 N.J. Super. 239, 260 (App. Div. 1997).  "The allowance of prejudgment interest in a contract action is largely dependent upon the application of principles of equity."  Manning Eng'r, Inc. v. Hudson Cnty. Park Comm'n, 71 N.J. 145, 159 (1976).

Here, having heard the testimony of the parties in this non-jury commercial case, the trial court had the opportunity to consider the various equities at stake and chose to not enhance the judgment for plaintiff with an award of prejudgment interest.  Moreover, as the trial court noted, the "Operating Agreement states that Members are not entitled to interest on

19

payments for the value of Membership. Therefore, [Jaime] is not entitled to interest on payments for the value of [his] membership."

To the extent we have not discussed them, we have considered all of the remaining arguments in the parties' briefs and deem them without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3996-21